**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALONZO HILL, | : |
| Petitioner, | : Civil Action No. 15-6835 (ES) |
| v. | : OPINION |
| STEPHEN JOHNSON, *et al.*, | : |
| Respondents. | : |

SALAS, DISTRICT JUDGE

Petitioner Alonzo Hill ("Petitioner"), a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has filed a *pro se* Petition (D.E. No. 1) for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons explained in this Opinion, the Court will deny the Petition and will also deny a certificate of appealability.

## II. Factual Background and Procedural History

The factual background and procedural history in this matter were summarized in part by the New Jersey Superior Court, Appellate Division upon Petitioner's direct appeal.[1] *State v. Hill*, No. A-6583-95 (N.J. Super. Ct. App. Div. Mar. 23, 1999) (slip op. at 4-6) (D.E. No. 15-8).

> On the evening of July 29, 1994, [Tony] Frazier, accompanied by Alonzo Hill and James Lomack (both of whom were in their early twenties), stole a tan Mercury Sable stationwagon from the driveway of the home of Irwin and Sandra McKnight in East Orange, New Jersey. When Mr. McKnight came from his backyard to investigate what was happening, the vehicle twice ran him over. Mrs. McKnight, who had just returned from grocery shopping, was in the vehicle when the three drove off; Hill was at the wheel. Mr. McKnight summoned the police after the car departed.

---

[1] The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

A short time thereafter, the three arrived in Roselle, New Jersey, looking for another car to replace the stationwagon. They came upon a 1988 white Saab parked in a driveway with its engine running; Lomack got in and the two cars drove off. Walter Durham, an off-duty Linden police officer, was the owner of the Saab. He and his cousin Larry Durham pursued the Saab in a Nissan Maxima belonging to Larry's mother. A high-speed chase ensued. Lomack drew a gun and fired repeatedly at his pursuers. Walter Durham returned fire with his service revolver. One of the bullets fired by Lomack grazed Larry Durham and the Maxima was hit several times by Lomack's fire. The Durham cousins lost the Saab when it turned onto the Garden State Parkway. They reported the theft to the Roselle police, who were unaware of the earlier incident in East Orange.

Later that evening, the McKnight vehicle was discovered parked near Vailsburg Park in Newark. Sandra McKnight's body was in the rear seat; she been shot once in the head. According to the medical examiner, the gun had been held against her head when it was fired.

Several weeks later, James Lomack was killed in a shoot-out with police in another municipality. Through investigation, the police linked Lomack to the McKnight murder; they were, in turn, led to Alonzo Hill and [Tony Frazier]. When Hill was arrested, he was found in possession of the keys to Walter Durham's Saab.

Hill testified at his trial and maintained that Frazier had committed the murder. He said he was unaware there was a gun in the car until he heard Frazier fire it at Mrs. McKnight as they were preparing to leave the car near Vailsburg Park. He denied instructing Frazier to kill her.

(D.E. No. 15-8 at 3-4 & 8-9).

Petitioner was convicted of second degree conspiracy to commit carjacking in violation of N.J. Stat. Ann. §§ 2C:5-2 and 2C:15-2; first degree kidnapping in violation of N.J. Stat. Ann. § 2C:13-1b(1); two counts of first-degree carjacking in violation of N.J. Stat. Ann. § 2C:15-2; second degree aggravated assault in violation of N.J. Stat. Ann. § 2C:12-1b(1); fourth-degree unlawful possession of a weapon in violation of N.J. Stat. Ann. § 2C:39-5d; third degree

possession of a weapon for an unlawful purpose in violation of N.J. Stat. Ann. § 2C:39-4d; third-degree conspiracy to commit theft in violation of N.J. Stat. Ann. §§ 2C:5-2 and 2C:20-3a; three counts of first-degree attempted murder in violation of N.J. Stat. Ann. §§ 2C:11-3 and 2C:5-1; two counts of third-degree possession of a firearm without a permit in violation of N.J. Stat. Ann. §§ 2C:39-5f and 2C:39-5b; two counts of second-degree possession of a firearm for an unlawful purpose in violation of N.J. Stat. Ann. § 2C:39-4a; murder in violation of N.J. Stat. Ann. §§ 2C:11-3a(1) and (2); and felony murder in violation of N.J. Stat. Ann. § 2C:11-3(a(3). (*Id.* at 2-3 & 8).

The Appellate Division affirmed Petitioner's conviction but remanded for resentencing as a result of the trial court's erroneous extended life term pursuant to N.J. Stat. Ann. § 2C: 43-7a(6), which had not become effective until after the decedent's murder. (*Id.* at 12). On August 27, 1999, the state court entered a new judgment of conviction ("JOC"), and Petitioner was sentenced to four consecutive terms of life imprisonment. (*See* D.E. No. 15-10). Petitioner must serve a 105-year term prior to parole eligibility. (*See id.* at 2). The New Jersey Supreme Court denied certification on June 9, 1999. *See State v. Hill*, 735 A.2d 572 (N.J. 1999).

Petitioner then filed a *pro se* petition for post-conviction relief ("PCR") on July 16, 1999. (D.E. No. 15-11). The record is silent as to any subsequent filings from either Petitioner or the State, or a disposition of the PCR petition for the next nine years. It was not until April 1, 2008, that Petitioner through counsel filed a motion for hearing on the PCR. (D.E. No. 15-12). Counsel, Ernest G. Ianetti, Esq., included a "Certification of Counsel re Excusable Neglect." (*Id.* at 5-8). Ianetti provided that he personally met with Petitioner shortly after the PCR was filed, and Petitioner provided the names of multiple witnesses that Petitioner maintained should

have been contacted by his trial counsel to aid in his defense. (*Id.* at 5-6). Counsel was unsuccessful at securing these individuals' cooperation and/or their contact information, and he relayed his skepticism of the likelihood of a successful PCR without these individuals' assistance. (*Id.* at 6). Counsel also provided that he "believed that [Petitioner] agreed with my assessment and would not pursue the Petition." (*Id.*). Thereafter, Petitioner filed an ethics complaint against Counsel, alleging that Counsel did not adequately represent Petitioner in his PCR proceeding. (*Id.*). In his response to the Office of Attorney Ethics, Counsel provided that he informed Petitioner of his bleak assessment of Petitioner's PCR case without the assistance of cooperating witnesses. (*Id.*). Counsel did not hear any follow up information about Petitioner's ethics complaint. (*Id.*).

It was not until 2008, that Counsel learned from the Public Defender's office that Petitioner was still seeking to have PCR submissions filed. (*Id.* at 7). Counsel offered that he experienced personal and financial difficulty that resulted in his law practice closing in the nine-year period since he last communicated with Petitioner, therefore creating an obstacle for Petitioner to contact him. (*Id.*).

A PCR hearing was subsequently granted and oral arguments took place before the Honorable Judge Michael J. Nelson on August 7, 2008. (D.E. No. 15-20 at 7). Judge Nelson issued a one-page written order denying the petition on March 30, 2009. (D.E. No. 15-14 at 2). The Appellate Division reversed and remanded the case to the PCR Court for either a determination that an evidentiary hearing is necessary or its findings of fact and conclusions of law. (D.E. No. 15-15). The PCR Court denied the petition as well as the request for an evidentiary hearing in a written opinion. (D.E. No. 15-16). The denial was subsequently

affirmed by the Appellate Division. *State v. Hill*, Indictment No. 95-03-1221, 2014 WL 8335867 (N.J. Super. Ct. App. Div. Mar. 30, 2015).

On July 10, 2015, the New Jersey Supreme Court denied Petitioner's petition for certification. *State v. Hill*, 116 A.3d 1073 (N.J. 2015). Petitioner filed the instant petition for habeas relief under § 2254 on September 14, 2015. (D.E. No. 1). Respondents filed their full Answer on June 28, 2016. (D.E No. 16). Petitioner filed a traverse on October 17, 2016. (D.E. No. 21). The matter is fully briefed and ready for disposition.

## III. Standard of Review

Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of state trial and appellate courts. *See Renico v. Lett*, 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated a petitioner's federal claim on the merits, a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 567 U.S. 37, 40-41 (2012) (quoting 28 U.S.C. § 2254(d)).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions," as of the time of the relevant state-court decision. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). If a decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of AEDPA necessarily apply. First, AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). Second, AEDPA precludes habeas relief unless the

adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the court of the State." 28 U.S.C. 2254(b)(1)(A). To do so, a petitioner must "fairly present' all federal claims to the highest state court before bringing them in a federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004). This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*, 504 F.3d at 365-66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007)) (other citations omitted). If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

To the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of

[petitioner's] claims on the merits, we need not address exhaustion."); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[u]nder 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

## IV.    Analysis

The Petition raises eleven grounds for relief, which are as follows:

1. "The Lower Court Erred in its Ruling that There was no Improper Admission of Evidence of Defendant's Possession of a Gun on Another Occasion which deprived him of the right to Due Process and a Fair Trial."

2. "The Lower Court's Ruling that There was No Misconduct of the Prosecutor's Cross-Examination of Defendant And Summation Remarks, which Unfairly Used Defendant's Prior Record to Suggest Criminal Propensity Rather Than to Impeach His Credibility, Deprived Defendant of the Right to Due Process of Law and A fair Trial."

3. "Inadequate Jury Instructions Concerning the Culpability Requirements For Vicarious Liability of A Conspiracy Deprived Defendant of the Right to Due Process of Law And A Fair Trial."

4. "The Lower Court's Ruling That Trial Counsel Was Not Ineffective When He Failed to Investigate And Call Witnesses on Defendant's Behalf Denied Petitioner The Right to Effective Assistance of Counsel."

5. "Trial Counsel was Ineffective for Failing to Make a Motion For Change of Venue; to Preclude other Crimes Evidence; present prejudicial photographs of the Victim; and to Provide the Court with a propose [sic] instructions regarding Co-Conspirator and Liability accomplice Liability and vicarious Liability."

6. "The Lower Court's Ruling That Defendant Was Procedurally Barred for Raising That He Was Prejudiced By the Court's Sua Sponte Decision to Increase Security During Petitioner's Trial Violated Petitioner's Right To Due Process Of Law."

7. "The Court Erred In Failing To Instruct The Jury On the Lesser-Included Offense Of Theft Of A Motor Vehicle With Respect To The Alleged Carjacking Of Walter Durham."

8. "The Lower Court's Ruling That Petitioner Did Not Establish A Prima Facie Showing When He Request For A New Trial Based on Two Recanting Witnesses Denied Petitioner His Constitutional Rights To Due Process of Law."

9. "The Lower Court Erred By Denying Petitioner's Claim of Appellate Counsel When He Failed to Meet With Him Or Otherwise Consult With Him And Did Not Present Issues To The Court That Defendant Wanted Heard."

10. "The Lower Court's Erred When It Rules That There Was No Conflict of Interest And That Petitioner's Was Not Denied Effective Assistance of PCR Counsel."

11. "The Lower Court Erred When It Rules That Petitioner Was Not Denied Effective Assistance of Post Conviction Relief/Collateral Attack Counsel."

(D.E. No. 1 at 4-19).

For the reasons explained below, the Court finds that Petitioner's claims do not warrant federal habeas relief.

## A. Trial Court Errors

### 1. The Trial Court's Erroneous Admission of Other Crimes Evidence was in Violation of Petitioner's Due Process Rights.

Petitioner argues that the trial court erroneously admitted a handgun that was in Petitioner's possession at the time of his arrest, several weeks after the murder, therefore resulting in the introduction of highly prejudicial propensity evidence in violation of Petitioner's constitutional rights.   (D.E. No. 1 at 6-8).

At Petitioner's trial, Detective Richard Herzer testified about Petitioner's arrest six weeks after decedent's murder.   (D.E. No. 16-4 at 6-56).   Petitioner, who was asleep in his sister's apartment when the arresting officers first encountered him, was awakened and handcuffed. (*Id.* at 10).   Detective Herzer then recovered a loaded .38 caliber handgun in between Petitioner's mattress and box spring.   (*Id.* at 11).   The trial court provided the following

limiting instruction immediately after Detective Herzer's testimony about recovering the

handgun:

> All right. Ladies and gentlemen, you are now going to hear some evidence about this weapon that was just mentioned by Mr. Herzer and you will also I expect hear testimony about certain appurtenances said to be associated with that weapon.
>
> This evidence is being admitted into this case for a limited purpose. It is not being admitted, for example, to show that since the defendant possessed a firearm on this date in September that he could have inferentially possessed a weapon on the day in question. It is not being offered for that purpose at all.
>
> But rather, it's being offered on a very limited purpose, which I will tell you about. In the course of the opening statement by the defense it appeared to me that the defense is offering a particular affirmative defense in this case which includes the assertion that at the time of the commission of the felony on Mrs. McKnight this defendant, among other things, had no reasonable ground to believe that any other participant was armed with a deadly weapon and that he was not armed with a deadly weapon.
>
> The reason why you're hearing the evidence about the weapon which was found in September is as it may or may not, in your judgment, relate to the defense's reasonable ground to believe on July 29th, that any other participant was armed with a deadly weapon.
>
> So it's admitted to go only to the state of mind on July 29th of this defendant as it relates to any reasonable belief that he may have had relative to the acts of other involved in possessing a deadly weapon.

(*Id.* at 10-11).

Detective Herzer proceeded to testify about recovering a holster and seven .38 caliber

bullets in the same room where Petitioner was found sleeping. (*Id.* at 12-13). At the close of

trial, the court provided additional jury instructions re-iterating the limited purpose for which the

jury could consider the gun, ammunition and holster in Petitioner's sleeping area on the day of

his arrest:

> You have heard evidence in the course of the trial that at the time of the arrest the defendant, Mr. Hill, was found to have a loaded operative .38 handgun under his mattress. You have also heard evidence that the defendant sold 2 guns which he removed from Lomack's girlfriend's apartment after Lomack's death. There was also testimony that the defendant while on parole continued to associate with James Lomack knowing that he was a convicted armed robber and knowing that association with him was violative of the requirements of parole. Your role as jurors requires you to evaluate this evidence like all of the evidence in the case and determine whether this evidence is credible and to be accepted by you. You are instructed that this evidence has been received for a specific limited purpose. You may consider this evidence solely as it pertains to the element of the affirmative defense that asserts that defendant had no reasonable ground to believe that any participant was armed with a deadly weapon. The evidence of defendant's own familiarity with guns and his continuing association with a convicted armed robber while himself on a parole may be considered by you as evidence of the lack of reasonable ground to believe that no one was armed as the 3 set out to do a carjacking or steal a car. Any other use of this evidence by you in your deliberations would be improper and I specifically instruct you that you must not consider this evidence in any other fashion whatsoever. This is so because our Rules of Evidence specifically state that evidence that a person committed a crime or civil wrong on another occasion is inadmissible to prove a disposition to commit a crime on this occasion. Therefore, you may not take this evidence and conclude from it that the defendant, Alonzo Hill, is a bad person and, thus, has a disposition which shows he is likely to have done the act with which he is charged or to show a general pre-disposition of the defendant to commit bad acts. That is not the purpose of allowing the testimony and it should not be considered by you as such.
>
> The Rules of Evidence, however, do permit such testimony where such evidence relates to some other issue in the case. Here, including the affirmative defense.
>
> Now, whether such testimony does in fact bear on such an issue is for you to decide. You may determine that the testimony does not bear on those issues, that is it had no bearing or relationship at

all to those issues.   In that event, you may disregard the testimony as not being helpful to you at all or you may consider such evidence as bearing on the affirmative defense that I just referred to.   That is for you to decide.   But what you may not do under the circumstances is consider such evidence as indicative of a general disposition to commit the crimes alleged here.

(D.E. No. 16-10 at 77-79).

The Appellate Division rejected this claim on direct appeal, providing the following:

We have carefully reviewed this record and note the strong limiting instruction that the trial court issued, both when the issue was first broached before the jury and then during the course of its final instructions.   The court clearly and forcefully informed the jury that it could consider that weapon only as it bore upon the reasonableness of defendant's asserted defense that on the evening of July 29 he had no reasonable ground to believe that either Lomack or Frazier was armed.   Further, the trial court specifically told the jury that it could not conclude that, because Hill had that weapon when he was arrested, he was therefore likely to have possessed a firearm on July 29.   We see no abuse of the trial court's discretion in its handling of this matter.

*Hill*, Indictment No. A-6583-95, (N.J. Super Ct. App. Div. Mar. 23, 1999) (slip op. at 10-11).

Petitioner argues that the introduction of evidence about the .38 caliber handgun found under his mattress at the time of the arrest, served no purpose other than to persuade the jury that Petitioner must have been culpable for the fatal events of July 29, 1994.   (D.E. No. 1 at 6-8). Furthermore, he maintains that the six-week passage of time between the car jackings and the recovery of the challenged evidence as well as the absence of any evidence that the decedent was killed by a .38 caliber handgun underscore the validity of his objection to the introduction of this evidence.   (*Id.* at 6-7).

Circuit courts have "previously recognized the probative value of uncharged acts to show motive, intent, and knowledge, whether the acts involved previous conduct or conduct subsequent to the

charged offense, as long as the uncharged acts are similar to the charged crime and sufficiently close in time. *See United States v. Olivo*, 80 F.3d 1466, 1468-69 (10th Cir. 1996); *United States v. Bonnett*, 877 F.2d 1450, 1461 (9th Cir. 1989). Moreover, although the uncharged crime must be similar to the charged offense, it need not be identical. *United States v. Gutierrez*, 696 F.2d 753, 755 (10th Cir. 1982). This similarity may be shown through "physical similarity of the acts or through the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic offense and charged offenses. *United States v. Queen*, 132 F.3d 991, 996 (4th Cir. 1997) (quoting *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978)). The more similar the act or state of mind is to the charged crime, the more relevant it becomes. *Id.*

*United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000) (internal quotation marks omitted).

The state court's application of clearly established federal law was not unreasonable. The trial court took great care to provide the jury with the relevant limiting instructions twice during the trial proceedings. (*See* D.E. No. 16-4 at 10-11; D.E. No. 16-10 at 77-79). The jury is presumed to have followed the instructions given to it by the trial judge. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Moreover, it cannot be understated, that introduction of this evidence was triggered by Petitioner having put forth the argument that he did not have knowledge of his co-conspirators being in possession of a firearm. *See United States v. Cassell*, 292 F.3d 788, 795 (D.C. Cir. 2002) ("A prior history of intentionally possessing guns, or for that matter chattels of any sort, is certainly relevant to the determination of whether a person in proximity to such a chattel on the occasion under litigation knew what he was possessing and intended to do so."). For the foregoing reasons, the Court denies relief on this ground.

2.     Erroneous Jury Instructions

Petitioner next claims that the trial court's jury instructions denied him his right to a fair trial. (D.E. No. 1 at 10-11 & 16-17). Petitioner raises these erroneous jury instruction claims

in grounds three and seven of his petition.  (*Id.*).  This Court will address both claims

simultaneously.

Vicarious liability instructions

First, Petitioner claims:

> "The State's theory to the jurors were that Petitioner could be
> convicted of the substantive crimes of carjacking, attempted
> murder, and murder, even though they were actually committed by
> a co-defendant and not the objects of the original conspiracy, so
> long as they were reasonably foreseeable as the necessary and
> natural consequences of the conspiracy.  However, over
> objection, the jurors were not advised the specific issue to be
> determined was whether petitioner knew that his companion had
> firearms so that the possession and subsequent use of firearms by
> petitioner's companions were reasonably foreseeable consequences
> of conspiracy.  As a result of this deficiency in the instructions,
> the jurors did not have appropriate guidance on this critical issue,
> and petitioner was deprived of the rude to due process of law and a
> fair trial."

(*Id.* at 10).

Petitioner unsuccessfully raised this specific jury instruction claim in his direct appeal;

the Appellate Division rejected the claim.   (*See* D.E. No. 15-8 at 12-13).

This Court's review of the trial record shows that the trial court's jury instruction

included detailed explanations of both the law of conspiracy liability and accomplice liability

and how they apply to the charges of murder, attempted murder, and carjacking, respectively.

With respect to the decedent, Sandra McKnight's murder, the trial court charged in part

as follows:

> It is the state's contention that this defendant, Alonzo Hill, did not
> personally shoot and kill Sandra McKnight.  The state calls to
> your attention evidence which may persuade you that she was shot
> by Tony Frazier.   In that event, you must consider whether this
> defendant, Mr. Hill, is criminally liable for the acts of Tony
> Frazier.   You will recall that there is evidence in the state's case

14

to the effect that the defendant told Tony Frazier do her or word to the effect.   It is up to you to determine whether those words were said and it is up to you to determine what the import of those words may have been.   These are things which are totally up to you.   As you consider those words, you must also consider the testimony of Mr. Hill who denies that he ever said them on the night in question.   But, rather, you will remember his testimony in which he says he did not even know that there was a gun until it was shot and Mrs. McKnight was already dead.   It's up to you, to you ladies and gentlemen, to consider that testimony and all the other testimony as you go about considering Mr. Hill's liability for the death of Mrs. McKnight.

Now, the law provides that a person is guilty of an offense if it is committed by his own conduct or the conduct of another person for which he is legally accountable or both.   A person is legally accountable for the conduct of another person when he is an accomplice of such person in the commission of an offense.   Up to this point all of the vicarious liability charged to Mr. Hill has been based on conspirator liability.   We are now bringing in a knew [sic] basis upon which you may, in considering all of the evidence, find Mr. Hill liable for the acts of another person and that is accomplice liability.   At this point I must now tell you what an accomplice is.   You must understand what an accomplice is.

A person is an accomplice of another person in the commission of an offense if with the purpose of promoting or facilitating the commission of the offense he solicits such other person to commit it and/or aids or agrees to aid such other person in planning or committing it.   This provision of the law means that not only is the person who actually commits the criminal act responsible for it but one who is legally accountable as accomplice is also responsible.   Now, this responsibility as accomplice may be equal and the same as that of the person who actually committed the crime or there may be responsibility in different degrees depending upon the circumstances as you may find them to be.   I will explain this to you further, but it is the state's contention in the indictment that Tony Frazer purposely and knowingly shot and killed Mrs. McKnight and that this defendant solicited that act and shared the knowing and purposeful mental state.   In other words, it was his purpose and he knew that the results of Frazier would cause the death of Mrs. McKnight.   That's the charge in the indictment as you have it.   In this case, the state alleges that the defendant is equally guilty of the crimes committed by Frazier

because he acted as his accomplice with the purpose that the specific crime of murder be committed. In order to find the defendant guilty of that specific crime, the state must prove beyond a reasonable doubt each of the following elements: That Frazier committed homicide. 2nd, that the defendant solicited him to commit or did agree to aid him in the planning or committing it with the knowledge and purpose that it result in her death. 3, that the defendant's purpose was to promote or facilitate the commission of the murder. And 4th, that the defendant possessed the criminal state of mind that is required to be proved against the person who actually committed the crime, purposely or knowingly causing death.

(D.E. No. 16-10 at 62-65).

The trial court then proceeded to provide the jury with the lesser included offenses of murder, in the event that they were not satisfied that Petitioner was guilty of murder. (*Id.* at 68-69). It subsequently provided the following instructions distinguishing accomplice liability from conspiracy liability:

Now, there is the accomplice theory of liability based upon the sharing of the identical mental state or the mental state or the mental state of the defendant to purposefully or knowingly cause the death of Mrs. McKnight. Accomplice liability depending upon the defendant's mental state. We've talked a lot on other occasions about co-conspirator liability, and you should also consider co-conspirator liability in the setting of the count charging the murder of Mrs. McKnight. If you are not persuaded beyond a reasonable doubt that this defendant, Mr. Hill, solicited the shooting of Mrs. McKnight by Frazier and, thus, was not Frazier's accomplice and did not share Frazier's mental state toward Mrs. McKnight, you must go on to consider whether he is responsible for the acts of Frazier by reason of co-conspirator's liability. The state alleges that even though Alonzo Hill did not personally commit murder for which he is charged, he is legally accountable for that crime which was committed by another person because the defendant was a participant in the conspiracy to commit carjacking or car theft.

You will recall that a conspiracy is an agreement to engage in conduct which constitutes a crime or an agreement to aid another person in planning or committing the crime. The crimes we're

talking about here are carjacking and car theft. The defendant must have agreed with the purpose or conscious object to promote or make it easier for one of the group to commit carjacking or car theft, the Mercury Sable. If you are not satisfied beyond a reasonable doubt that the state has proven all of the essential elements of the crime you are considering and that someone committed the crime of murder, then your inquiry ends here and you must return a verdict of not guilty as to this defendant. Therefore, the following instructions on conspiracy are only for your use if you find beyond a reasonable doubt that someone committed the crime of murder.

Our law provides a person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable or both. A person is legally responsible for the acts of another person when he is engaged in a conspiracy with such other person. Thus, you must decide whether the defendant engaged in a conspiracy with Tony Frazier to commit the crime of carjacking and car theft. If you find the acts of Tony Frazier in shooting Mrs. McKnight were actually within the scope of the conspiracy, then you would find criminal responsibility for those acts although defendant did not personally participate. It is up to you to determine what the scope of the conspiracy was, what was the agreement, if there was. If you find there was an agreement to commit carjacking, was the agreement including the murder of the person. Did the agreement include the homicide of the person? This is something, ladies and gentlemen, which is up to you to determine. The question of the scope of the conspiracy is to be determined by you based upon the evidence that you have in the record before you. If you find that the particular act done by another was not actually within the contemplation of the defendant, you must determine whether it is objectively foreseeable or reasonable to be anticipated that those criminal acts would be committed in view of the obvious risks surrounding the attempts to execute the conspiracy or whether the substantive crime occurred or was committed in a manner that was too far removed or too remote from the objectives of the original conspiracy. The defendant may be held criminally responsible for the acts of others which he did not personally contemplate if those acts are within a reasonably foreseeable risk arising out of the criminal conduct undertaken to effectuate the conspiracy and occurring as the necessary or natural consequence of the conspiracy. The criminal acts must be reasonably and closely connected to the conspiracy even though those crimes may not have been within the actual contemplation of the conspirators or

within the scope of the conspiracy as originally planned. You must determine whether, given the risks of the enterprise, it was reasonably foreseeable in the course of an unlawful taking of a motor vehicle that the person remaining as an occupant inside the vehicle, that some homicidal act of a co-conspirator would occur as a necessary or natural consequence of the conspiracy.

Now, as you are considering conspirator liability, you are not considering so much the mental state of the defendant as you must in accomplice liability but, rather, you are to consider the mental state of Tony Frazier and whether his acts were within the context of the conspiracy, either part of the agreement itself or objectively foreseeable or reasonably to be anticipated. That's the difference between the responsibility of a co-conspirator and the responsibility of an accomplice. You may find liability as an accomplice and a co-conspirator. You may not. But you may consider vicarious liability based on theories, accomplice and/or conspirator.

(*Id.* at 69-72).

The trial court provided the following jury instruction for the counts related to the attempted murder of Walter and Larry Durham:

Now, we're talking now about the attempted murder of the Durhams, and the attempted murder of the Durhams is said to be the responsibility of Mr. Hill because Mr. Hill was conspirator with Lomack to steal the Saab and it was foreseeable that in the course of stealing the Saab, fleeing while being pursued, Lomack would try to kill his pursuers. That's, in a nutshell, the theory. The legal words, our law provides that a person is guilty of an offense it is committed by his own conduct or by the conduct of another person for which he is legally accountable. A person is legally responsible for the acts of another when he engaged in the conspiracy with such other person, and you must decide whether the defendant engaged in a conspiracy to commit car theft, the theft of the Saab. In this regard, the state does not contend that the attempted murder of Walter and Larry Durham during the car chase was part of the actual plan to take the Saab. However, you must determine whether it was reasonably foreseeable in the course of an unlawful taking of the motor vehicle that attempted murder would occur as a necessary or natural consequence of that conspiracy. You must determine whether it is objectively foreseeable or reasonably to anticipate that these criminal acts

18

would be committed in view of the obvious risks surrounding the efforts to execute the conspiracy, the taking of the Saab and the flight thereafter, or whether the attempted murders occurred or were committed in a manner that was too far removed or too from the objectives of the original conspiracy. The defendant may not be held criminally responsible for the acts of others which he did not personally contemplate if those acts were within a reasonably -- I think I put a negative in here so I'm going to reread it: The person may be held criminally responsible for the acts of others which he did not personally contemplate if those acts are within a reasonably foreseeable risk arising out of the criminal conduct undertaken to effectuate the conspiracy and occurring as the necessary or natural consequences of the conspiracy. The criminal acts must be reasonably and closely connected to the conspiracy even though those crimes may not have been within the actual contemplation of the conspirators or within the scope of the conspiracy as originally planned. If you are satisfied beyond a reasonable doubt that defendant conspired with Lomack to steal the Saab and in the course of the theft of the Saab Lomack attempted to murder Walter and Larry Durham and that his act was objectively foreseeable or reasonably to be anticipated and was not too far removed or too remote from the objective of the conspiracy to steal the Saab, you will find defendant guilty of the attempted murders. If you are not so satisfied, you will find defendant not guilty on those counts, 10 and 11.

(*Id.* at 52-54).

Petitioner's claim does not meet the high threshold required to establish a meritorious jury instruction claim as established by federal law.

[Q]uestions relating to jury charges are normally matters of state law and not cognizable in federal habeas review. *See Engle v. Isaac*, 456 U.S. 107 (1982); *Henderson v. Kibbe*, 431 U.S. 145 (1977); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 309 (3d Cir.), cert. denied, 502 U.S. 902 (1991); *Grecco v. O'Lone*, 661 F.Supp. 408, 412 (D.N.J.1987). [T]he district court must consider "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' ... not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson*, 431 U.S. at 154 (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)).

*Porter v. Brown*, No. 04-4415, 2006 WL 2640624, at *8 (D.N.J. Sept. 12, 2006).

Petitioner's argument that the murder instruction should have included an instruction that Petitioner must have been knowledgeable of an existence of a deadly weapon, negates the existence of evidence that Petitioner directed Tony Frazier to kill the decedent. The court's instruction on alternative theories of liability reflect the possibility that Petitioner knew that his co-conspirators had deadly weapons when they set out to steal cars and also that Petitioner himself ordered the decedent's killing. The New Jersey criminal jury instruction did not require that the jury be provided with any affirmative defenses. Nonetheless, the jury heard both Petitioner's testimony and his counsel's argument that he was unaware of the existence of firearms on any of his co-conspirators that night. (D.E. No. 16-7 at 28-29; D.E. No. 16-9 at 21-26 & 31-34). The jury as fact finders were solely responsible for determining which theory they believed. "[T]here was no evidence of ultimate juror confusion as to the test for accomplice liability under [state] law." *Waddington v. Sarausad*, 555 U.S. 179, 193 (2009).

With respect to the attempted murder charges for the attempts on Irvin McKnight's life, Petitioner himself testified that he ran Mr. McKnight over with the vehicle as he attempted to flee the scene of the McKnight home in their vehicle. (D.E. No. 16-7 at 29). While Petitioner maintained that he accidentally hit Mr. McKnight with the car because of items in the vehicle's back seat that obstructed his view, that fact did not go to the principle of vicarious liability. (*Id.*).

Finally, with respect to the attempted murder charges for the attempts on Walter and Larry Durham's life, the state never argued that Petitioner was by any means directly responsible for shooting the Durhams. The evidence showed that co-conspirator, James Lomack, stole Durham's car from a driveway and drove it independently while Petitioner and Frazier drove in

the decedent's vehicle. (*Id.* at 30). Lomack shot at the Durhams while attempting to lose their trail. (D.E. No. 16-1 at 180).

Petitioner has not demonstrated any defect with the trial court's jury instructions. Petitioner appears to disagree with the jury's rejection of his defense that could have significantly minimized his liability. Nonetheless, the record demonstrates that the trial court provided adequate instruction on the relevant law. Moreover, the Appellate Division's decision was not an unreasonable application of clearly established federal law.

<u>The Saab Carjacking Instruction Should Have Included the Elements of the Crime of Theft</u>

Petitioner also argues that the trial court erroneously failed to provide the jury with the elements of theft despite the evidence demonstrating that Walter Durham's Saab was unattended at the time it was taken. (D.E. No. 1 at 16).

At Petitioner's trial, Officer Walter Durham, testified that on the evening of July 29, 1994, he parked his white Saab in his uncle's driveway, left the keys in the ignition and entered his uncle's Roselle, New Jersey home. (D.E. No. 16-1 at 161). Shortly after entering the kitchen area of the home, Durham recognized the sound of his car's horn and went back outside. (*Id.* at 162). Durham observed his vehicle in motion and began following the vehicle in another vehicle driven by his cousin. (*Id.*). The chase resulted in the Durhams both being shot at by the driver in the Saab. (*Id.* at 180-89). That person was eventually identified as James Lomack. (*Id.* at 196-97).

New Jersey's carjacking statute provides in part, the following:

> A person is guilty of carjacking if in the course of committing an unlawful taking of a motor vehicle, as defined in R.S. 39:1-1, or in an attempt to commit an unlawful taking of a motor vehicle he:
> (3) commits or threatens immediately to commit any crime of the first or second degree;

> An act shall be deemed to be in the course of committing an unlawful taking of a motor vehicle if it occurs during an attempt to commit the unlawful taking of a motor vehicle or during an immediate flight after the attempt or commission.

N.J. Stat. Ann. § 2C:15-2.

Petitioner's argument that the offense was nothing more than a theft because the Saab was found unattended, is contrary to the plain language of the carjacking statute as it was provided to the jury. The record reflects that Walter Durham and his cousin Larry pursued the stolen Saab as it was driving away from the home where it was parked. (D.E. No. 16-1 at 164). Despite Petitioner's submission in his traverse, that Durham "spotted his vehicle at a later time," the record reflects that there did not appear to be a considerable break in time between when Walter Durham first observed his car being driven off and when he boarded his cousin's car to pursue the perpetrator. (*Id.*). Moreover, Petitioner was also found guilty of conspiracy to commit a carjacking; therefore, all of Lomack's conduct, specifically shooting at the Durhams while in the Saab, was attributed to Petitioner. *See State v. Samuels*, 914 A.2d 1250, 1256 (N.J. 2007) ("[C]onspiracy conviction can only stand if an agreement reasonably can be discerned from the circumstantial evidence."). Petitioner has not demonstrated how the trial court's carjacking instruction with respect to Walter Durham's vehicle was improper pursuant to state law and certainly has not demonstrated how it violates his constitutional due process rights. Accordingly, Petitioner is denied relief with respect to this claim.

### B.  Prosecutorial Misconduct

Petitioner next asserts that the prosecutor's repeated references to Petitioner's criminal history on cross-examination and in closing arguments suggested Petitioner's propensity for criminality and thus violated Petitioner's constitutional rights. (D.E. No. 1 at 9).

The trial court ruled in advance of Petitioner's case in chief that Petitioner's prior robbery conviction would have to be sanitized, consistent with New Jersey law limiting the evidence of prior similar crimes to avoid unfair prejudice to the defendant. *See State v. Brunson*, 625 A.2d 1085 (N.J. 1993); (D.E. No. 16-7 at 17-18).

During cross-examination, the prosecution questioned Petitioner's interchangeable use of the terms "robbery" and "stealing cars." (D.E. No. 16-8 at 7). More specifically, the prosecutor highlighted Petitioner's use of the word "robbery" in his testimony when describing the events of July 29, 1994, but the use of the term "stolen cars" in his post-arrest statement to police. (*Id.* at 6-8). The prosecutor urged that Petitioner consciously avoided the use of the term "robbery" or "robbing" until he heard the state witness's trial testimony that indicated that was how Petitioner described his plans to make extra money mere hours before the decedent's carjacking and murder. (D.E. No. 16-9 at 43-44). The prosecution further submitted that Petitioner's calculating testimony was a means to convey to the jury that he used the terms interchangeably although he only considered his conduct on July 29, 1994, to constitute theft and not robbery. (*Id.*). During the course of this exchange, the prosecution attempted to establish that Petitioner did in fact know the difference between the two offenses with the following line of questioning:

Q: What about taking money from a woman's purse: what do you call that?
A: Just the way you said it.
Q: What do you call that?
A: Taking money from a women's purse.
Q: So if you're going out robbing someone's purse you say: Hey, guys, I'm going out and going to take money from a woman's purse: right, that's what you said?
A: I don't go out taking money from woman's purses.
Q: You said on July 29, 1994—
A: Didn't take nothing out of her purse.
Q: You took money; didn't you, Mr. Hill?
A: From Jim: yes.

Q:   That's what Jim-Jim got from the women's purse after you took her in her vehicle; right, Mr. Hill?

A:   I got money from Jim-Jim.

Q:   What did you call that?   Why don't you tell the jury what you called that.

A:   I didn't call it nothing.

Q:   What do you call it when you get money from a captive women's purse?   What do you call that crime, Mr. Hill?

A:   I don't know.

Q:   Do you call it stealing cars?

A:   Judge, I object.   Sidebar please.

THE COURT:   No.

Q:   Do you call it stealing cars?

A:   Call what stealing cars?

Q:   Taking money from a captive woman's purse: what crime do you call that, Mr. Hill?

A:   I don't call it no crime.

Q:   You think that's allowable under the laws of the state of New Jersey, Mr. Hill?

A:   No.

Q:   It's not stealing cars; is it, Mr. Hill?

A:   No.

Q:   And you know that taking money from somebody is called robbery when you use force?

MR. KAPIN:   My objection would be that there is no count in the indictment reflecting that aspect of the case.

THE COURT:   This is the defendant's testimony and part of his main contention relative to what the state claims in his statement.   And I'm going to allow the prosecutor to explore the language, wherever it takes us.   The last questions read back.

(The last question read.)

THE WITNESS:   When you use force, yes.   I guess so: could be a theft.   It could be a theft.

Q:   What about when you use force?

A:   Robbery, I guess.

Q:   And you are familiar with the crime of robbery: are you not, Mr. Hill?

MR. KAPIN:   I would object.

THE COURT:   I know.   I overrule the objection.

MR. KAPIN:   Thank you.

Q:   You are familiar with the crime of robbery:   aren't you, Mr. Hill?

A:   Yes.

Q:   And you know that the crime of robbery and armed robbery is totally different from the crime of car theft: don't you, Mr. Hill?

A:   Yes.

Q:   And you know that the crime of robbery and armed robbery is totally different from the crime of car theft; don't you, Mr. Hill?

A:   Yes.

Q:   You're aware of that right?

A:   Yes.

Q:   Aware back on July 29, 1994 that they are 2 totally separate and distinct crimes?

A:   Yes.

Q:   Despite the fact you claim to this jury that robbery and stealing cars in your mind—
MR.   KAPIN:   Objection as to "claim," and argumentative.
THE COURT:   Yes.   Please correct the question.   It is argumentative.
Q:   Back in July 1994, you knew that they were 2 separate and distinct crimes of car theft and armed robbery?
A:   Yes.
Q:   You knew it back then?
A:   Yes.
Q:   And you know it today as you testify?
A:   Yes.
Q:   And you know they have different punishments for those 2 crimes; correct?
A:   Yes.
Q:   And you knew when you went out that Friday evening with James Lomack that James Lomack had, in fact, been convicted of robbery in the past: right, Mr. Hill?
A:   Yes.

(D.E. No. 16-8 at 7-8).

The state court rejected Petitioner's prosecutorial misconduct claim on direct appeal, while yielding that Petitioner's counsel should have been allowed to place objections on the record.   (*See* D.E. No. 15-8 at 12).

The cited colloquy does not establish misconduct on the prosecutor's part.   The prosecutor did not refer to any of Petitioner's prior convictions, albeit he did reference, then deceased, co-conspirator James Lomack's prior robbery conviction.   (D.E. No. 16-8 at 8). Moreover, the line of questioning about Petitioner's recent release from prison and subsequent decision to engage in criminal activity and associate with a convicted felon despite the terms of his parole, did not violate the trial court's *Brunson* ruling nor did it constitute a violation of Petitioner's due process rights.   *See Greer v. Miller*, 483 U.S. 756, 765 (1987) ("[T]o constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial.") (citations and internal quotation marks omitted)).

Finally, the prosecutor's closing arguments references Petitioner's testimony on cross-examination to undermine Petitioner's feigned ignorance on the issue of whether his co-conspirators' were armed on the night of the murder. (D.E. No. 16-9 at 45-49). Undermining Petitioner's testimony that he was unaware of the presence of guns on that fateful night was an appropriate strategy in light of Petitioner's insistence that his only intent was to steal cars. The prosecutor did reference Petitioner's lengthy criminal history again during summation, but argued that it was only to undermine Petitioner's credibility. (*Id.* at 48-49). Petitioner takes particular issue with the prosecutor's use of the phrase "common criminal sense" in his closing argument. (D.E. No. 21 at 16). This Court's review of the trial record reads the prosecutor's use of the challenged phrase "common criminal sense" to suggest that Petitioner's actions and thought process as a convicted criminal on the night of the murder were consistent with the reality of non-criminals who would have found themselves in the same situation. (D.E. No. 16-9 at 39). The same phrase was used again near the close of the prosecutor's arguments, this time again, immediately preceded by the phrase "common sense" as a means to implore members of the jury that the sequence of the events following the decedent's abduction plainly reconciled with Petitioner's goal to not to be identified with the offense. (D.E. No. 16-9 at 77). Petitioner has not demonstrated how the closing remarks "so infected the trial with unfairness to make the resulting conviction a denial of due process." *United States v. Berrios*, 676 F.3d 118, 135 (3d Cir. 2012) (citations and internal quotation marks omitted).

Consequently, Petitioner has not established that the state court's application of federal law was unreasonable. Habeas relief is denied with respect to this claim.

## C.    Trial Court's Purported Heightened Security Measures

Petitioner argues in ground six of his petition that the PCR Court violated his constitutional due process rights for denying the underlying claim as procedurally barred pursuant to state law.  (D.E. No. 1 at 14-16).   The Appellate Division affirmed the PCR Court's denial, ruling that Petitioner could have brought the claim on direct appeal.  *See Hill*, 2014 WL 8335867 at *7.    Respondents submit that this claim is procedurally barred, nonetheless, this Court denies the claim on the merits.   *See Bronshtein*, 404 F.3d at 707-710.

At a pre-trial hearing on April 1, 1996, the trial court addressed an issue that was brought before the court's attention months prior, that Petitioner threatened to assault his attorney. (D.E. No. 15-26 at 5).   The trial court responded by having Petitioner restrained in shackles at that hearing.  (*Id.*).   Trial counsel objected to the shackles immediately and the following colloquy ensued:

MR. KAPIN:    Judge, wondering if I could have my client's handcuffs removed?
THE COURT:    No.
MR. KAPIN:    Wondering if I could have them moved.
THE COURT:    No.   I heard this on a prior occasion.   Your client announced to the law enforcement officers, here the Sheriff's officers protecting security of the court, that it was his intention to assault you, to do that in order to oust you, tangentially, to secure I'm sure an adjournment of the matter.    It's not going to happen, and for that reason this defendant is going to be handcuffed in the back and I'm going to have to discuss how to keep him during the trial of the matter.   It is my understanding that there is available and there has been used in the past a kind of a desk which has - - what used to be called a modesty shield which conceals the legs and lower body of the occupant.   This device has inside of the modesty panels loops to which one hand of the occupant can be fastened.   I have looked into that, I know it has been used in this courthouse in other cases where there has been threatened violence and it's my consideration that we will be using that here unless I am persuaded to the contrary.
MR. KAPIN:    Well, let's address some of the other things first.   Maybe we should introduce ourselves for the record.    Albert Kapin on behalf of Alonzo Hill.
MS. SAVOY:    Cassandra Savoy on behalf of Tony Frazier.
MR. TAYLOR:    Stephen Taylor representing the state.
MR. KAPIN:    It would seem to me if the threats were made concerning me, I should put on the record my motion with regard to these threats or purported threats, and I recall the day in question.   Since that day I've had numerous meetings with my client without the benefit of

restraints in the Essex County Jail. I've had no problem with him whatsoever. I anticipate that if he were to be handcuffed in any way during the trial, particularly given the nature of the allegations here, he would not be able to receive a fair trial. I expect that he might be a witness in this proceeding and I can't imagine how that vanity shield should apply should he be a testifying witness. It would seem to me that I am satisfied as the prospective target of these allegations that there's not going to be a problem, that in my view I have no problem with him being uncuffed. I would prefer him to be uncuffed so we can take notes at this time. So I would ask the Court to factor that in. It would be a strenuous objection to say the least to have him any any way restrained at this point. If during these proceedings the Court were to see any problem, whatsoever, the Court could act accordingly, but I would ask the Court to take it on faith at this point that there would be no problem.

THE COURT: Well, unfortunately, Mr. Kapin while the Court will be able to see when and it happens, any such effort could without any doubt be accomplished in less than one second I myself could do it in one less one second. So, therefore, it would be a little too late after seeing or by the time one sees the deed is done. We're going to leave him cuffed behind when we have no jury present. I'll consider what to do when we have a jury present. In [sic] he wishes to assault you in the presence of a jury, the case will go forward with that jury knowing what to make of the character of the assaulter, but I don't have that added protection of the jury present here, so I'm going to use the handcuffs.

MR. KAPIN: If the Court is going to use the handcuffs, it would be my position it would be appropriate to handcuff in the front. It's very uncomfortable for them to sit in this way up against handcuffs and I respect these hearings are going to take some time. It's not as if it's going to be a very short truncated matter. I expect we're going to be here most of, if not all, of tomorrow, tomorrow and the balance of today.

THE COURT: I would think so.

MR. KAPIN: I think security could be accomplished if they were handcuffed in the front.

THE COURT: I don't think so. I told I could do it in less than a 2nd, handcuffed in front of me.

MR. KAPIN: Do what, judge? I'm sorry.

THE COURT: Assault the person next to me. I have no problem with it. Let's go.

MR. KAPIN: My position just for the record.

THE COURT: I know. I understand. I've explained my reasons.

MR. KAPIN: I just want the record clear that it's not me in any way requesting this be done.

THE COURT: We also have a history here in this courthouse of at least 2 serious assaults on persons seated at counsel table, and that's why I'm so certain I can do it personally in less than a second, I know how to do it. Okay.

THE DEFENDANT: I don't get to say nothing about that matter?

THE COURT: No, sir.

(*Id.* at 5-8).

The trial court resumed its discussion of the issue of trial security on the following day—this time with the input of chief of court security, Chief Tamburro. (D.E. No. 15-27 at

3-19).   The court pondered the security measures it could take once trial commenced and decided on designating assigned spaces at the counsel table creating sufficient space for security officers to intervene in the event of an altercation between Petitioner and trial counsel.   (*Id.* at 15).   Trial counsel objected to this option on the basis of the potential for unfair prejudice to the Petitioner should the jury perceive the distance as an indication of Petitioner's dangerous nature. (*Id.*).   Counsel's request for a brief recess to confer with the court security personnel was granted and counsel subsequently expressed his amenability to the proposed measure.   (*Id.* at 17-18).   The trial record does not reflect any further discussion of any security concerns or objections to any heightened security measures during the course of the trial.

The United States Supreme Court articulated that when determining whether the "conspicuous" or "noticeable deployment of security personnel in a courtroom during trial" is prejudicial, "[a]ll a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they say was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial."   *Holbrook v. Flynn*, 475 U.S. 560, 568, 572 (1986).

Petitioner has not provided any factual basis to determine that there were any heightened security measures in place other than the assigned seating at the defense table.   He does not indicate, nor does the record reflect, that extra court officers were assigned to that particular courtroom during Petitioner's trial.   Assuming arguendo that there were, the record reflects a legitimate security threat from the Petitioner himself, who expressed an intent to harm his counsel, albeit months before the trial commenced.   (D.E. No. 15-27 at 13).   Moreover, the record reflects that the trial judge and the attorneys discussed the high-profile nature of the case, the media interest in the case and the recent history of physical attacks against attorneys in that

particular courthouse.   (*Id.* at 13-14).   If there were additional security officers in the courtroom, it could have been to maintain an orderly courtroom, protect the attorneys from overbearing reporters interested in obtaining statements or just for the overall security of everyone in the courtroom.   Unlike the facts of *Holbrook*, where defense counsel objected to a group of uniformed state troopers positioned in the row of seats directly behind the defendants during the trial, the record here does not indicate what if anything the jury may have observed that was out of the ordinary.   *Holbrook*, 475 U.S. at 570.   In his traverse, Petitioner adds that the trial court's refusal to allow Petitioner an opportunity to respond to the trial judge's security concerns, was a violation of his due process rights.   (D.E. No. 21 at 52-53).   However, he still fails to provide any additional information about what he constituted to be an increased security measure at his trial.   Therefore, Petitioner has not demonstrated that any additional security measures were taken and certainly not that any security measures that could be deemed inherently prejudicial, were at play.   Thus, Petitioner is denied relief with respect to this claim.

### D.        PCR Court Erroneously Denied Petitioner's Motion for New Trial

Petitioner submits in ground eight of his federal habeas petition, that recantations from two key state witnesses, Derrick McKenzie and Daniel Jackson warranted a new trial despite the PCR court's erroneous decision otherwise.   (D.E. No. 17).   Respondents provide that this claim is procedurally defaulted because of Petitioner's failure to provide certifications in support of his claim to the state court.   (D.E. No. 15 at 80-81).   This Court begins by noting that there is absolutely no basis in the record that supports that either Jackson or McKenzie ever recanted or indicated that they wanted to recant their testimony.

The state court rejected this claim, opining,

> Defendant's assertion that the two witnesses who implicated him
> in the crimes have recanted their statements finds no support in the
> record. His bald assertions that these witnesses would recant
> sworn testimony is insufficient to established a prima facie claim
> for relief.

*See Hill*, 2014 WL 8335867 at *7 (citation omitted).

Petitioner failed to provide a factual basis for this recantation claim in his initial federal habeas petition filing as well. In his traverse filing in this Court, Petitioner finally provided, what both Jackson and McKenzie may have provided had counsel secured their affidavits.

Petitioner submits that Jackson could have certified that his testimony downplayed his relationship with Petitioner. (D.E. No. 21 at 65). According to Petitioner, despite Jackson's testimony on direct examination, that Petitioner was an associate and coworker, he was actually his biological cousin. (*Id.*). Moreover, Petitioner vaguely submits that Jackson could have also certified that some of his statements and testimony were false. (*Id.*).

Contrary to Petitioner's assertion that Jackson's familial relationship with Petitioner was not established, the record reflects that the prosecutor refers to Jackson as Petitioner's "blood cousin" in his closing argument. (D.E. No. 16-9 at 43). Notwithstanding this inconsistency about their familial relationship, Petitioner does not identify what part of Jackson's testimony would have been recanted.

Petitioner also finally sheds light on what the now-deceased Derrick McKenzie would have purportedly provided in his certification. Petitioner submits that McKenzie falsely testified about who actually took possession of James Lomack's firearms after his death. (D.E. No. 21 at 65). Petitioner adds that McKenzie's certification would have also stated that he provided perjured testimony as a form of retribution against Petitioner who McKenzie saw as somehow involved in his brother James Lomack's death. (*Id.* at 65-66). This Court notes that

Petitioner does not indicate when or how it was that he learned that either Jackson or McKenzie considered recanting their trial testimony.

The state court rejected this claim as having "no support in the record" and this Court agrees. *See Hill*, 2014 WL 8335867 at *7. Petitioner did not provide any factual basis to the state court to support his claim that these two individuals recanted their trial testimony. *See Zettlemoyer v. Fulcomer,* 923 F.2d 284, 301 (3d Cir. 1991) ("[B]ald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the state to respond to discovery or to require an evidentiary hearing."). Therefore, Petitioner is denied habeas relief with respect to this claim.

### E. Ineffective Assistance of Counsel

The balance of Petitioner's claims is ineffective assistance claims against his trial, appellate and PCR counsels. The Supreme Court set forth the standard by which courts must evaluate claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. *Id.* This requirement involves demonstrating that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687. Second, the defendant must show that he was prejudiced by the deficient performance. *Id.* This requires showing that counsel's errors deprived the defendant of a fair trial. *Id.*

Counsel's performance is deficient if his representation falls "below an objective standard of reasonableness" or outside of the "wide range of professionally competent assistance." *Id.* at 690. In examining the question of deficiency, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. In addition, judges must consider the facts of the case at the time of counsel's conduct, and must make every effort to

escape what the *Strickland* court referred to as the "distorting effects of hindsight." *Id.* The petitioner bears the burden of showing that counsel's challenged action was not sound strategy. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Furthermore, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694.

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Pinholster*, 131 S.Ct. at 1403). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted). "With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d. Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

1.    Ineffective Assistance of Trial Counsel

Petitioner alleges in grounds four and five of his petition, that he was deprived of his Sixth Amendment right to counsel due to his trial counsel's ineffective assistance. (D.E. No. 1 at 12-13). Petitioner first contends that he objected to counsel's representation during the pre-trial phase, when counsel indicated "that he would be unable to construct any defense." (*Id.* at 13). Moreover, Petitioner claims that counsel failed to call several witnesses in Petitioner's defense despite Petitioner's assertions that they would be able to effectively undermine the state's case. (*Id.*). Petitioner next claims that trial counsel failed to move for a change of venue, failed to object to the admissibility of prejudicial other crimes evidence as well as prejudicial photographs of the victim and finally that trial counsel failed to provide the trial court with proposed jury instructions on conspiracy liability and accomplice liability. (*Id.* at 13). Petitioner unsuccessfully raised all of the aforementioned ineffective assistance claims before the PCR court. (D.E. No. 15-16). This Court will address all of the claims pertaining to trial counsel simultaneously.

The state court summarily rejected the claims against trial counsel, determining:

> At the outset, it should be noted that under *Strickland*, an attorney need not present every argument that the defendant urges as a part of its case in chief. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Moreover, trial counsel is left to its years of experience to determine all necessary strategies for trial. Thus, counsel is not required to advance every conceivable argument that its client desire to assert during the trial or on appeal. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). To that end, Petitioner has failed to meet its burden in proving its claim for ineffective assistance of counsel as it applies to the first, second and sixth points asserted in Petitioner's application.
>
> Further, on the first point raised by Petitioner regarding trial counsel's failure to call or contact witnesses for pre-trial and trial proceedings, the Court was not provided with affidavits confirming

the allegations raised by the Petitioner until today, October 19, 2012. The Court having read the affidavits is not satisfied and would continue to deny the request for an evidentiary hearing and relief under PCR. The Court finds th affidavits severely out of time. Moreover, PCR counsel notes in his certification that he made several attempts to contact the requested parties on Petitioner's behalf and was met with opposition. Thus, there is no indication that trial counsel would have been able to receive the cooperation of the said witnesses had he attempted to contact them. Finally, the Petitioner does not indicate how calling the said witnesses would have helped him at trial, or even how such testimony could have been admitted under the New Jersey Court Rules of Evidence for relevancy. Additionally, given the substantial evidence presented by the State, Petitioner has not established a prima facie case. Thus, the Court cannot grant Petitioner's request based on the blind assertions made in his application.

(*Id.* at 7-8).

<u>Failure to call additional defense witnesses</u>

Petitioner argues that counsel "failed to call Shawn Hill, Danielle "Daniels" Elliot[2]. [sic] Frederick Lowery, William Carter, Tonique Griffin, and Tonya Lewis all who could have bolstered defendant's claims and contradict the State's Theory of the procedure in which Petitioner was arrested." (D.E. No. 1 at 12). Petitioner's initial federal habeas filing does not put forth what aspect of the arrest these individuals would have been able to provide testimony on or what if anything about his arrest violated any of his rights. However, his traverse sheds lights on what these individuals' potential testimony may have included.

In his PCR petition, Petitioner provided a brief proffer of what some of the aforementioned individuals' testimony would have been had counsel called them to testify at

---

[2] Petitioner refers to Danielle by multiple last names, Daniels and Elliott. To avoid any confusion, she will be referred to by her first name in this Opinion.

trial. (D.E. No. 15-19 at 78-81). Additionally, Al-Nisa Hill, Shawn Hill and Danielle

submitted certifications to the PCR court. (D.E. No. 15-16 at 7-8; D.E. No. 15-21 at 32-39).

When denying his PCR petition, the trial court provided-

> Further, on the first point raised by Petitioner regarding trial
> counsel's failure to call or contact witnesses for pre-trial and trial
> proceedings, the Court was not provided with affidavits confirming
> the allegations raised by the Petitioner until today, October 19,
> 2012. The Court having read the affidavits is not satisfied and
> would continue to deny the request for an evidentiary hearing and
> relief under PCR. The Court finds the affidavits severely out of
> time. Moreover, PCR counsel notes in his Certification that he
> made several attempts to contact the requested parties on
> Petitioner's behalf and was met with opposition. Thus, there is
> no indication that trial counsel would have been able to receive the
> cooperation of the said witnesses had he attempted to contact them.
> Finally, the Petitioner does not indicate how calling the said
> witnesses would have helped him at trial, or even how such
> testimony could have been admitted under the New Jersey Court
> Rules of Evidence for relevancy. Additionally, given the
> substantial evidence presented by the State, Petitioner has not
> established a prima facie case. Thus, the Court cannot grant
> Petitioner's request based on the blind assertions made in his
> application.

(D.E. No. 15-16 at 7-8).

The Appellate Division affirmed the PCR denial and articulated that it too was not

swayed by the three affidavits provided by the two Hill sisters and Danielle.

> Defendant's claim that his counsel failed to investigate the
> circumstances surrounding his statement to the police and
> invocation of his right to counsel and to call witnesses to testify
> that defendant requested counsel and sought to exercise his right to
> remain silent before making a statement to the police is squarely
> refuted by the record. Trial counsel moved to preclude
> defendant's statement to the police. Counsel called one of
> defendant's sisters to testify at the *Miranda* hearing, and she and
> defendant testified at length. Judge Perretti did not find either
> one to be a credible witness. She concluded the police advised
> defendant of his rights, that he understood them and that he

voluntarily waived them without threats, promises, psychological pressures or inducement.

Further, trial counsel stated on the record that he had met with defendant twenty times in the course of preparing for trial. Counsel succeeded in having two counts of the indictment dismissed, moved to suppress the gun seized from defendant at the time of his arrest and hired a ballistics expert on his behalf. Defendant has presented no proof of his claims that his counsel failed to adequately investigate the case or that additional witnesses would have changed the result of the *Miranda* hearing. Having reviewed the additional certifications defendant submitted to the court in 2012, we note they are not consistent with defendant's statements in his 2008 verified petition. In light of Judge Perretti's findings at the *Miranda* hearing based on the testimony of defendant and his sister, we cannot conclude that had counsel been able to secure the testimony of these additional witnesses that the result would have been different.

*See Hill*, 2014 WL 8335867 at *6.

This Court reviewed Petitioner's submission to the state court and will address his proffer in both his state and federal habeas filings, if any, as to each witness.

### Shawn Hill

Petitioner submits in his federal habeas petition that, "Shawn Hill was a principle witness to the statement given during petitioner's interrogation so much so that her signature is on the statement." (D.E. No. 1 at 12). The record reflects that Petitioner's older sister, Shawn Hill, did join Petitioner in the interview room at his request. (D.E. No. 15-27 at 95-104). Lieutenant Carrega testified at a pre-trial hearing, that after providing both Petitioner and Shawn Hill with food and refreshments, Petitioner read and signed a form waiving his *Miranda* rights. (*Id.* at 103). Moreover, Shawn Hill signed the card as a witness to Petitioner's waiver. (*Id.* at 104).

The record reflects that Petitioner's younger sister, Al-Nisa Hill, testified about the circumstances surrounding Petitioner's arrest and his subsequent police interview, at a pre-trial hearing. (D.E. No. at 15-29 at 88). Al-Nisa Hill testified that she and her sister Shawn were in the interview room with Petitioner shortly before he provided a statement. (*Id.* at 126-131). She testified that his cooperation stemmed from his concern that police would charge Al-Nisa with criminal charges, as they had threatened. (*Id.* at 91-94 & 129-30). According to Al-Nisa, notwithstanding her brother's request for a lawyer just moments prior, the law enforcement personnel in the room used the threat of prosecuting Al-Nisa to encourage Petitioner's cooperation. (*Id.* at 96 & 129). Al-Nisa testified that she did not remain in the room when Petitioner provided the statement. (*Id.* at 131). She also testified that she was coerced into allowing the police to search her apartment shortly after Petitioner's apprehension. (*Id.* at 114-119). Investigator Patrick DeFrancisci's testimony contradicted Al-Nisa Hill's testimony that she was coerced into giving consent to search her apartment. (D.E. No. 15-27 at 167). The trial court determined that Al-Nisa Hill's testimony was incredible in its entirety. (D.E. No. 15-29 at 200-201).

As for his proffer as to his sister Shawn's potential testimony, trial counsel's decision to not call the elder Hill sister could have been a strategic decision, particularly in light of the trial court's complete rejection of their younger sister, Al-Nisa Hill's testimony. Despite Petitioner's bald allegations that his sister Shawn could have testified about the coercive nature of the post-arrest interview, Shawn's presence in the interview room throughout the entire duration of Petitioner's statement and her serving as a witness to the *Miranda* waiver could have contradicted Petitioner's claim that his waiver was not voluntary. *See Henderson v.*

*DiGuglielmo*, 138 F. App'x 463, 470 (3d Cir. 2005) ("[S]trategic decision did not constitute unreasonable professional performance under *Strickland*.") (citation omitted).

Danielle

As to his then-girlfriend, Danielle, Petitioner submits in his federal habeas petition that, "Danielle Daniels was also present during both the interrogation and statement taken by petitioner." (D.E. No. 1 at 12). In his PCR petition, Petitioner submitted that Danielle could have testified about the police search of her home as well as the police's intentions with respect to bringing her to the office shortly after Petitioner's arrest. (D.E. No. 15-19 at 79). The state court reviewed Danielle's 2012 certifications to the PCR court and deemed the certification inconsistent with Petitioner's 2008 submission to the court and unlikely to have changed the outcome of Petitioner's trial proceedings. *See Hill*, 2014 WL 8335867 at *6.

Contrary to Petitioner's claim that Danielle was also present during his interview, Lieutenant Carrega testified at Petitioner's pre-trial hearing that Danielle was in the squad room, which he testified was different from the interview room. (*Id.* at 128). Moreover, the record reflects that Danielle was not present at the time of Petitioner's arrest in his sister's Irvington, New Jersey apartment and there was no testimony or evidence introduced at Petitioner's trial as a result of the purported search of Danielle's home. (D.E. No. 15-29 at 92-93).

Tanya Lewis

Next, Petitioner offered in his PCR petition that Tanya Lewis, who was co-conspirator James Lomack's girlfriend up until the time of his death, "would have testified to the events about her apartment being searched and what was said about me in connection with this crime and another crime that no one wants to talk about." (D.E. No. 15-19 at 80).

As for Tanya Lewis' potential testimony, this is once again a bald assertion from Petitioner that he does not support with any further factual information. Petitioner does not explain the significance of the alleged conversation between Lewis and the officers who searched her home or how this could have aided in Petitioner's defense. In his traverse, Petitioner provides that Lewis could have supported Petitioner's claim that Derrick McKenzie[3] fabricated his testimony about who really took possession of co-conspirator's James Lomack's firearms after Lomack's death. (D.E. No. 21 at 43-44).

<u>Frederick Lowery and William Carter</u>

Petitioner also proffered that both Frederick Lowery and the now-deceased William Carter could have helped establish that Petitioner requested counsel immediately after his arrest. (*Id.*). In his traverse, he adds that both men could have testified about the circumstances of Petitioner's interrogation and arrest, particularly the officers' misrepresentation to both Al-Nisa Hill and Petitioner that they were executing an arrest warrant for Sandra McKnight's murder, when in actuality they only had a warrant for charges of receipt of stolen property. (*Id.* at 42-43).

Petitioner's claim that both Frederick Lowery and William Carter witnessed Petitioner's request for an attorney is a bald assertion that he does not support with any facts. The record reflects that both Lowery and Carter were both at Al-Nisa Hill's apartment at the time of Petitioner's arrest. (D.E. No. 15-29 at 85). However, it is unclear what part of the apartment Lowery was in at the time of Petitioner's arrest. More importantly, Petitioner's own testimony

---

[3]      Petitioner refers to Derrick McKenzie as "Derrick Lomack" in his traverse. (D.E. No. 21 at 43). At Petitioner's trial, McKenzie testified that he was James Lomack's brother (D.E. No. 16-5 at 4); however, nothing in the record indicates that McKenzie used the surname Lomack.

at his pre-trial suppression hearing was that he asked for an attorney while he was detained alone in a police vehicle outside of his sister's home.    (*Id.* at 136 & 138).

Tonique Griffin

Lastly, although Petitioner's initial filing in this Court did not provide any details about Tonique Griffin's supposed involvement in his arrest, he provides additional facts in his traverse, that Griffin's home was also searched on the day of Petitioner's arrest.    (D.E. No. 21 at 43). Petitioner does not explain this information's relevance other than she may have been able to provide "any information that was told to her about the reason(s) why they were looking for petitioner.    (*Id.*).

This Court finds that Petitioner has not demonstrated that the state court decision was unreasonable.    *See Matteo v. Superintendent*, 171 F.3d 877, 891 (3d Cir. 1999).    The record suggests that Petitioner advised his trial counsel to investigate certain witnesses in advance of trial, but Petitioner's own submission provides that he was unaware of whether trial counsel in fact did so or not.[4]    (D.E. No. 15-19 at 83).    He also does not provide any information about when he learned of some of the information that these individuals had, particularly Tanya Lewis's supposed conversations with law enforcement about other crimes, that could have potentially assisted in Petitioner's defense.

Petitioner has not established that trial counsel did not investigate these witnesses nor that counsel's decision not to call these witnesses was not born out of a sound trial strategy. Moreover, this Court acknowledges Respondents' argument that Petitioner's PCR counsel certified that he unsuccessfully attempted to contact some of the above-named individuals, albeit

---

[4]    In Petitioner's PCR filing, he submits "I also informed Judge Perretti that Mr. Kapin was not investigating my case and that he had not contacted the witnesses I listed above.    Judge Perretti responded that I could not say Mr. Kapin was not representing me because he still had time to interview the witnesses I was asking about.    To my knowledge, however, he never did it."    (D.E. No. 15-12 at 21-22).

his attempts were more than three years after Petitioner's trial. Further, despite their earlier lack of cooperation during Petitioner's post-conviction proceedings, Al-Nisa Hill, Shawn Hill and Danielle finally provided affidavits certifying what their testimony would have entailed, over a decade and a half after Petitioner's trial, which the PCR court rejected as unsatisfactory and the Appellate Division concurred. (D.E. No. 15-16 at 7). The state court's application of clearly established federal law was not unreasonable. Therefore, Petitioner is not entitled to federal habeas relief on this claim.

<u>Failure to move for a change of venue</u>

Petitioner also claims that trial counsel failed to move for a change of venue despite the obvious potential of prejudice trying a carjacking case in that jurisdiction during the relevant time period. (D.E. No. 1 at 13). Petitioner bases this claim on the extensive news coverage of the onslaught of carjackings that occurred in Essex County during this timeframe. (*Id.*). Moreover, Petitioner argues that the media's interest in his particular case, which was brought to the trial court's attention numerous times by trial counsel, necessitated a change of venue. (*Id.*). Petitioner argues that notwithstanding his counsel's efforts of bringing the media focus on area-car jackings to the court's attention, he stopped short of making a formal written or oral motion for a change of venue. (*Id.*).

The Appellate Division summarily disposed of this claim, stating the following- "Regarding defendant's claim that his counsel failed to file a formal motion for change of venue, to preclude other crimes evidence and prejudicial photographs of the victim, we note that Judge Perretti stated on the record, in response to defendant's request, that she would not grant a motion to change venue." *Hill*, 2014 WL 8335867 at *6.

> "In a habeas corpus proceeding such as this, the inquiry narrows to whether the refusal to change venue amounts to a denial of the defendant's constitutional rights. Publicity standing alone, however, has only rarely been held to demand a change of venue and, when it has, there usually has been evidence of insensitive and active official involvement in its promotion and prorogation."

*Martin v. Warden*, 653 F.2d 799, 804, 805 (3d Cir. 1981).

Here, the record reflects that the trial court granted counsel's request that the jury venire be questioned about specific issues such as: any predisposed ethnic/racial bias due to the decedent having been identified as white and her assailants being identified as black; their awareness of and sentiments on the rash of local car jackings that were publicized in the media; and their knowledge of Petitioner's case and his criminal history, particularly in light of an article that was published just days before jury selection began. (D.E. No. 15-32 at 9-16).

Petitioner has not established how trial counsel's not moving for change of venue was ineffective under *Strickland*. The record demonstrates that the jury venire was adequately questioned during jury selection. Prospective jurors who indicated that they were peripherally aware of the case, did not appear to recall particular details of the murder, which by that point had occurred almost two years prior. (D.E. No. 15-32 at 82 & 85-91). There were no statements by any impaneled jurors that suggested they had already decided Petitioner's guilt even if they had heard of the McKnight murder generally. *See Martin*, 653 F.2d at 806 ("A juror's ignorance may not be expected; only a juror's impartiality can be assured."). The state court's decision to deny relief with respect to this claim was not an unreasonable application of clearly established federal law. Consequently, Petitioner is denied habeas relief with respect to this claim.

<u>Failure to Preclude Prejudicial Photographs of the Victim</u>

Petitioner next argues that trial counsel's failure to object to prejudicial photographs of the decedent was ineffective. (D.E. No. 1 at 13). Petitioner is not specific about which photographs of the decedent he considered prejudicial.

The Appellate Division briefly rejected the claim stating, "Defendant nowhere identifies the pictures of the victim he claims prejudiced him or notes whether counsel objected to their admission." *Hill*, 2014 WL 8335867 at *6.

At Petitioner's trial, the state introduced decedent's photographs through witnesses, Trooper Andre Robinson of the New Jersey State Police, Investigator Stephen Bright of the Essex County Prosecutor's Office as well as medical examiner, Dr. Marie McCajoux. (D.E. No. 16-3 at 10-45; D.E. No. 16-7 at 6-12). Trooper Robinson, who was the first law enforcement personnel member to encounter the decedent's vehicle after the carjacking, testified about looking into the back seat of decedent's stolen vehicle and observing what appeared to be a woman sleeping. (D.E. No. 16-3 at 13). Trooper Robinson testified that the pictures depicted the woman's head covered with a towel. (*Id.* at 18).

Investigator Bright then testified about a series of pictures of both the interior of decedent's vehicle at the time it was found, which included a picture of a bone fragment, ammunition shell casing and rubber surgical gloves in the front seat area, as well as the decedent's corpse as she appeared when discovered by the police. (*Id.* at 26-30 & 37-39). Trial counsel unsuccessfully objected to the admission of the photographs. (*Id.* at 35-36 & 41-45). Counsel argued that there was no argument about the decedent's cause of death and that Petitioner was in the vehicle at the time. (*Id.* at 36). Moreover, counsel objected that they would possibly be cumulative because the autopsy pictures that would presumably be introduced

44

by the state through other witnesses would potentially depict the same injuries on the decedent. (*Id.* at 42).

The trial court rejected both objections responding:

> There is massive contest on the issue of the causes of death, but that she was shot in the head is obviously not disputed. How she was shot is hotly contested, so anything at all that indicates how she was shot, that this was not an accident, that this was in fact as the state contends an execution is in the case. I don't see that these are anything other than crime-scene photographs. They are not particularly inflammatory, they are not particularly gruesome. I've seen each and every one of them and I do not see that they are cumulative.

(*Id.* at 44-45).

Trial counsel subsequently objected to one particular photograph that appeared to have the decedent's brain matter in the photograph. (*Id.* at 46). The trial court responded that it had already ruled on the specific photograph. (*Id.*).

Trial counsel later objected to all of the autopsy photographs of the decedent, particularly those which he characterized as "dirty," showing the entry wound as well as decedent's brain matter on one side of her head. (D.E. No. 16-7 at 4). While the trial court agreed that one photograph in particular was gruesome, it ruled that the image was probative to the state's case that this was an intentional execution. (*Id.* at 6). The trial court agreed with the state's argument that the photograph's depiction of gun powder on the side of decedent's head was proof that the murder weapon made contact with her head prior to her being shot and it further dispelled the notion of "the gun just going off." (*Id.* at 5). Nonetheless, the trial court granted trial counsel's request that a curative instruction be provided to the jury that the images "should not inflame your passion." (*Id.* at 7).

The United States Supreme Court in *Old Chief v. United States*, 519 U.S. 172 (1997), provided a thorough analysis of the balancing act conducted by trial courts when weighing the probative nature of evidence versus the possibility of prejudice. There, the Supreme Court addressed the issue of whether the admission of evidence of defendant's prior criminal conviction for a similar offense as that charged despite defendant's offer to stipulate to the prior conviction without naming the crime of conviction was prejudicial. *Id.* at 176-77.

> "But there is something even more to the prosecution's interest in resisting efforts to replace the evidence of its choice with admissions and stipulations, for beyond the power of conventional evidence to support allegations and give life to the moral underpinnings of law's claims, there lies the need for evidence in all its particularity to satisfy the jurors' expectations about what proper proof should be. Some such demands they bring with them to the courthouse, assuming, for example, that a charge of using a firearm to commit an offense will be proven by introducing a gun in evidence. A prosecutor who fails to produce one, or some good reason for his failure, has something to be concerned about.

*Id.* at 188.

Additionally, as one court has compiled, several circuit courts of appeals have rejected due process claims involving the admission of gruesome evidence.

> *See Franklin v. Bradshaw*, 695 F.3d 439, 456-57 (6th Cir. 2012) (rejecting claim that autopsy photographs of charred, disfigured, and gory remains of victims denied petitioner the fundamental right to a fair trial); *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (holding admittedly gruesome photographs of victim's severed head, severed breast, and torso depicting pre-and post-mortem injuries demonstrated defendant's intent to kill and mutilate, and that court's limited instruction was sufficient to guarantee fundamentally fair trial); *Cooey v. Coyle*, 289 F.3d 882, 893-94 (6th Cir. 2002) (finding gruesome and duplicative photographs were highly probative and did not "raise the spectre of fundamental fairness such as to violate federal due process of law"). Many other circuit courts of appeals have done so as well. *Lyons v Brady*, 666 F.3d 51, 54-56 (1st Cir. 2012); *Wilson*

> *v. Sirmons*, 536 F.3d 1064, 1114-16 (10th Cir. 2008); *Rousan v. Roper*, 436 F.3d 951, 958-59 (8th Cir. 2006); *Woods v. Johnson*, 75 F.3d 1017, 1038-39 (5th Cir. 1996); *Gomez v. Ahitow*, 29 F.3d 1128, 1139-40 (7th Cir. 1994); *Batchelor v. Cupp*, 693 F.2d 859, 865 (9th Cir. 1982).

*Ahmed v. Houk*, No. 07-0658, 2014 WL 2709765 at *82 (S.D. Ohio June 16, 2014).

Here, Petitioner has not established how the prosecution's use of the photographs violated his due process rights. The prosecution supported its theory of the case that Petitioner was aware of the murder weapon's existence in the vehicle because he was the one that ordered Tony Frazier to shoot decedent. Some of the images, while offensive, were, as the trial court ruled, essential to proving the charged crimes. Finally, Petitioner has not established how counsel's performance was ineffective. The record, as reflected above, establishes trial counsel's numerous objections to the photographs. Consequently, the state court's ruling was not an unreasonable application of clearly established federal law. Petitioner is denied relief with respect to this claim.

## Failure to Move for Exclusion of Prejudicial Evidence

Petitioner argues that trial counsel's failure to move to exclude the .38 caliber handgun that was retrieved at the time of his arrest was ineffective assistance. (D.E. No. 1 at 13). It should be noted that although the state court rejected Petitioner's claim that the .38 caliber gun was unlawfully admitted into evidence, this federal habeas petition is the first instance where Petitioner raises the claim within the context of an ineffective assistance of counsel. In light of this Court's rejection of Petitioner's claim that the trial court's admission of the .38 caliber handgun was a violation of Petitioner's due process, Petitioner has not established how counsel's representation was ineffective. *See supra* Section A. 1. Moreover, the record reflects that trial

counsel vigorously objected to the introduction of the handgun into evidence, notwithstanding the strong basis for its admission.    (D.E. No. 15-31 at 64-79).

<u>Failure to Provide Proposed Accomplice Liability and Conspiratorial Liability Instructions</u>

Petitioner also argues that trial counsel's failure to provide the trial court with proposed vicarious liability instructions was ineffective.    (D.E. No. 1 at 13).    This Court's review of these particular instructions and rejection of Petitioner's due process claim undermines Petitioner's argument that counsel's performance was in anyway deficient.    *See supra* Section A.2.    Additionally, as the Appellate Division noted at Petitioner's PCR appeal: "He also nowhere explains the effect of his counsel's alleged failure to provide the court with proposed instructions regarding conspirator liability, accomplice liability and vicarious liability.    His counsel objected to the court's instructions at trial, and appellate counsel pressed the issue on appeal."    *See Hill*, 2014 WL 8335867 at *6.    Consequently, Petitioner has not demonstrated how counsel's representation was ineffective.

For the foregoing reasons, Petitioner is denied relief with respect to all of his claims of ineffective assistance of trial counsel.

## F.    PCR Court Erroneously Denied Petitioner's Ineffective Assistance of Appellate Counsel Claim

Petitioner argues in ground nine of his federal habeas petition that his appellate counsel's failure to consult with him about the issues raised on direct appeal was ineffective assistance. (D.E. No. 1 at 18-19).

The Appellate Division opined upon affirming the PCR Court's decision to deny Petitioner ineffective assistance of appellate counsel claim:

> As for defendant's claim that appellate counsel failed to consult with him and omitted issues he wished included in the appeal, it is well-established that appellate counsel need not advance every

48

argument a defendant urged, even if non-frivolous. *Jones v. Barnes*, 463 U.S. 745, 750-54, 103 S.Ct. 3308, 3312-14, 77 L.Ed.2d 987, 993-95 (1983). Appellate counsel raised five claims on appeal, three of which are variants of claims defendant has raised on PCR. The other two claims asserted errors in defendant's sentence resulting in a remand and consequent reduction in sentence. Because defendant offers no basis on which we could conclude that the failure to have raised additional or different issues on direct appeal would have altered its result, we reject his claim. *Preciose*, supra, 129 N.J. at 463-64.

*See Hill*, 2014 WL 8335867 at *7.

Ineffective assistance of appellate counsel is analyzed under the *Strickland* standard. *See Albrecht v. Horn*, 485 F.3d 103, 137 (3d Cir. 2007) (quoting *United States v. Mannino*, 212 F.3d 835, 840 n.4 (3d Cir. 2000)). The two-part *Strickland* test requires this court to first determine whether counsel's performance was deficient, which in the context of an appeal requires evaluation of counsel's failure to raise proper issues on appeal. *See Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996) ("[I]t is a well established principle that counsel decides which issues to pursue on appeal."). Secondly, Petitioner must show that but for his counsel's failure to raise the omitted issue, he would have prevailed on his appeal. *See Pichardo v. Nelson*, No. 13-6930, 2015 WL 9412918, at *11 (D.N.J. Dec. 22, 2015) (quoting *Smith v. Robbins*, 528 U.S. 259, 285 (2000)).

Here, Petitioner did not identify a single potential legal issue that could have been challenged on direct appeal to support his claim of appellate counsel's dereliction until he filed his traverse in this Court. (D.E. No. 21 at 69-70). Assuming arguendo that Petitioner did suggest certain appeal strategies with his appellate counsel, the state court's reasoning that counsel was not obligated to raise every claim raised by the defendant, was not an unreasonable application of clearly established federal law. *See Jones v. Barnes*, 463 U.S. 745, 753 (1983)

49

("A brief that raises every colorable issue runs the risk of burying good arguments."). Consequently, the state court's decision was not an unreasonable application of clearly established federal law. Petitioner is denied habeas relief with respect to this claim.

### G. PCR Court's Erroneous Decision to Deny the Ineffective Assistance of PCR Counsel Claims

Petitioner's final claims raised in grounds ten and eleven of his federal habeas petition will be addressed simultaneously.

First, Petitioner argues that the Appellate Division erroneously denied his ineffective assistance of PCR counsel claim, despite the conflict of interest with Attorney Ernest Ianetti. (D.E. No. 1 at 19-20). Secondly, Petitioner argues that PCR Counsel's failure to obtain certifications from several individuals who Petitioner advised him to investigate, was ineffective. (*Id.* at 21-22). Petitioner submits that counsel's certification that he unsuccessfully tried to contact some of the individuals that Petitioner advised him to several years prior, was a misrepresentation to the court. (*Id.* at 21-22).

As previously detailed, the procedural history in this case involved a significant period of time where Petitioner was purportedly unaware of the status of his PCR filing. Petitioner eventually filed an ethics complaint against Attorney Ianetti alleging that counsel failed to pursue the PCR petition. (D.E. No. 15-12 at 6). The ethics complaint did not appear to have resolved the supposed miscommunication, as Attorney Ianetti provided that he did not hear any follow up to his response to the complaint. (*Id.*). Petitioner and Ianetti eventually appeared before a PCR Court in 2008. (D.E. No. 16-13). At that proceeding, Petitioner expressed his dissatisfaction with his attorney's brief in support of his PCR application, but nonetheless, indicated to the court that he did not want to have counsel relieved. *See Hill*, 2014 WL 8335867 at *4.

50

The Appellate Division reviewed what it referred to as the "tortured procedural history from the filing of the petition in 1999" before rejecting Petitioner's ineffective assistance claim. *Id.* at *6.

> Finally, we reject defendant's claim that the matter must be remanded because PCR counsel, who allegedly provided ineffective assistance, represented him on the remand. PCR claims of ineffective assistance grounded in alleged attorney conflicts are analyzed under our conflicts rules as applied in criminal cases. See generally *State v. Bellucci*, 81 N.J. 531 (1980). We held in *State v. Drisco*, 355 N.J. Super. 283, 294-95 (App. Div. 2002), certif. denied, 178 N.J. 252 (2003), that unlike in cases of dual representation, prejudice is not presumed by defendant's allegation of conflict created by the defendant having previously charged trial counsel with ineffectiveness. Instead, "the potential or actual conflict of interest must be evaluated and, if significant, a great likelihood of prejudice must be shown in that particular case to establish constitutionally defective representation of counsel." *State v. Norman*, 151 N.J. 5, 25 (1997).
>
> Although we acknowledge the possibility of conflict when a defense attorney has been previously charged with ineffective assistance by the client, we are also aware that ineffective assistance claims are commonplace and not every such filing creates an adversarial relationship between client ad lawyer compromising the lawyer's ability to defend the case effectively *Drisco*, *supra*, 355 N.J. Super. at 294. Here, defendant has not demonstrated any conflict, much less one so significant as to present "a great likelihood of prejudice." *Norman*, *supra*, 151 N.J. at 25. Indeed, defendant took pains to explain to the PCR court in 2008 that he was not seeking to replace his counsel and that it was counsel who first broached the topic. Under these circumstances, we reject defendant's claim that a further remand is required in this already protracted manner.

*Id.* at *7-8.

Here, Petitioner's ineffective assistance claim is solely based on PCR counsel's representation during the prolonged life of the PCR petition. (D.E. No. 1 at 19-22). There is no federal constitutional right to counsel in post-conviction collateral proceedings, and as such

Petitioner cannot bring this ineffective assistance of counsel claim. *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). In light of the foregoing, all of Petitioner's claims of ineffective assistance of trial/appellate/PCR counsel are denied.

## V.     CONCLUSION

For the reasons discussed above, Petitioner's habeas petition is denied.

## VI.     Motion to Proceed In Forma Pauperis

On March 19, 2018, Petitioner filed a notice of appeal of this Court's order dated February 9, 2018, (D.E. No. 29), denying his "motion to alter/amend the court's judgment on his production of transcripts of prior proceedings" to the United States Court of Appeal for the Third Circuit. (D.E. No. 31). Petitioner's appeal was docketed as case number 18-1628. (D.E. No. 32). Petitioner also filed a motion to proceed *in forma pauperis*. (D.E. No. 30). Petitioner's underlying production demand was for transcripts of various pre-trial proceedings during the time period ranging from April 1995 to April 1996. (D.E. No. 23-2). On June 5, 2017, this Court denied Petitioner's discovery request due to Petitioner's failure to indicate the purpose of the discovery demand noting that his reply was already filed. (D.E. No. 26). Petitioner then filed a "motion to alter/amend the court's judgment on his production of transcripts of prior proceedings" where he specified the purpose of his discovery demand was to support his ineffective assistance claim with respect to the issue of heightened trial security. (D.E. No. 27-2). This Court subsequently denied the motion that Petitioner now appeals.

This Court retains jurisdiction as Petitioner's appeal, 18-1628, was an appeal from a nonappealable order. *See Venen v. Sweet*, 758 F.2d 117, 121 (3d Cir. 1985) (citation omitted) ("One exception, in both civil and criminal cases is that the jurisdiction of the lower court to proceed in a cause is not lost by the taking of an appeal from an order or judgment which is not

appealable."). "[D]iscovery orders are not final orders of the district court for purposes of obtaining appellate jurisdiction under 28 U.S.C. § 1291." *Bacher v. Allstate Ins. Co.*, 211 F.3d 52, 53 (3d Cir. 2000). Moreover, the requested information does not satisfy the collateral order doctrine, as it is not privileged nor is it a trade secret. *Id.*

## VII. Certificate of Appealability

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter. *See* 3d Cir. LAR 22.1. The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Based on the discussion in this Opinion, Petitioner has not made a substantial showing of denial of a constitutional right, and this Court will not issue a certificate of appealability.

Appropriate Orders follow.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**